NURSING HOME GROUP REHABILITATION SERVICES,
L.L.C., Appellee and Cross–Appellant,

v.

SUNCREST HEALTH CARE, INC., d.b.a. Care First Nursing & Rehab
Center, et al.; Griffeth, Appellant and Cross–Appellee.

[Cite as *Nursing Home Group Rehab. Servs., Inc. v. Suncrest
Health Care, Inc.,* 162 Ohio App.3d 577, 2005-Ohio-3945.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22046.

Decided Aug. 3, 2005.

Richard C. Kenney Jr., and Robert D. Kehoe, for appellant and cross-appellee.

Timothy N. Toma, Patricia A. Fisher, and Donald W. Davis, for appellee and cross-appellant.

SLABY, Presiding Judge.

{¶ 1} Appellant, Gerald Griffeth, appeals from a judgment of the Summit County Court of Common Pleas that granted judgment against Griffeth and awarded damages of $113,000 plus prejudgment interest to appellee, Nursing Home Group Rehabilitation Services, L.L.C. ("the Nursing Home Group"). We reverse and remand.

{¶ 2} Griffeth has owned and operated Griffeth Nursing Home in Mansfield for many years and has been in the nursing home business since 1965. In 1998, Griffeth, was approached by Russell Corwin, his accountant, with a new business opportunity. Corwin proposed that Griffeth lease and operate an existing nursing home facility in Akron. Corwin had run various business projections and believed that the facility was a good business opportunity for someone like Griffeth who had experience operating a nursing home. The facility was an older building in need of many renovations, but Corwin and Griffeth believed that the landlord was planning to make considerable improvements to the facility.

{¶ 3} Griffeth, as the sole shareholder and director, incorporated the new business under the name of Suncrest Health Care, Inc. Griffeth hired a management company and a nursing home administrator to operate the nursing home on a day-to-day basis. The Suncrest facility was financed by a $500,000 secured line of credit at Provident Bank. The purpose of the loan was to provide working capital for the business and it was secured by certain assets of Suncrest. Griffeth signed as a guarantor of the loan, both personally and on behalf of Griffeth Nursing Home. The account was set up as a sweep account, meaning that all deposits were applied to the credit line until it was totally paid down. By the explicit terms of the account, this "sweep" operated automatically and a borrower could not affect the process. Only excess money deposited (after the credit line was completely paid down) would become a positive balance in the account. There was only a short period, however, when the account had a positive balance on deposit.

{¶ 4} Although Suncrest was profitable during its first year of operation because its resident population initially increased, revenues later declined because

Suncrest was unable to maintain its resident population at a profitable level. Witnesses suggested that the problem was due, in part, to the declining condition of the building and the landlord's failure to make necessary renovations.

{¶ 5} Suncrest initially had an in-house staff of therapists, but it did not always need their services on a full-time basis. In an effort to decrease its costs, Suncrest's nursing home administrator, with the approval of the management company, negotiated a contract with the Nursing Home Group, an outside firm, to provide therapy services to its residents. Because the Nursing Home Group did not investigate Suncrest's financial status, it was apparently unaware of Suncrest's declining financial situation. The Nursing Home Group likewise failed to secure Suncrest's obligations to it with anything other than the contract, signed by the nursing home administrator on behalf of Suncrest.

{¶ 6} Despite many efforts to increase its resident population and to decrease its costs, Suncrest's financial problems only grew worse over time. Suncrest failed to pay four of the invoices that it received from the Nursing Home Group, which totaled well over $100,000.

{¶ 7} Suncrest ceased operating on July 31, 2001. On August 7, 2001, a Medicare Part A reimbursement check for $18,571.62 was deposited into Suncrest's bank account. On August 15, 2001, another $399,823.01 was deposited as Medicaid reimbursement. By the automatic-sweep terms of the account, those deposits were automatically applied to the line of credit. Even after those deposits, the credit line balance was over $100,000.

{¶ 8} Several of Suncrest's creditors were not paid all that Suncrest owed them. The Nursing Home Group did not receive payment for four of the invoices it submitted to Suncrest and consequently filed this action against Suncrest and Griffeth. After the Nursing Home Group dismissed some additional claims, the case against Griffeth was based on a theory that the Nursing Home Group could pierce the corporate veil and hold Griffeth personally liable for Suncrest's breach of contract.

{¶ 9} The case proceeded to a jury trial against Griffeth. Griffeth moved for a directed verdict at the end of opening statements and at the close of the plaintiff's evidence. The trial court denied both motions and the case went to the jury on the evidence of the Nursing Home Group. The jury found in favor of the Nursing Home Group and found that it had sustained damages in the amount of $113,000. The trial court entered judgment on the jury's verdict and also awarded prejudgment and postjudgment interest. The trial court subsequently entered a default judgment, including a comparable award of damages and interest, against Suncrest.

{¶ 10} Griffeth appeals and raises three assignments of error. The Nursing Home Group cross-appeals and raises two cross-assignments of error. We will address only Griffeth's second assignment of error because it is dispositive.

## ASSIGNMENT OF ERROR II

The trial court erred by denying Gerald R. Griffeth's motion for directed verdict made at the close of the evidence presented by the Nursing Home Group Rehabilitation Services, LLC.

{¶ 11} Griffeth's first assignment of error is that the trial court erred in failing to grant him a directed verdict after the Nursing Home Group presented its evidence against him. It is undisputed that Griffeth was not personally a party to the contract, nor was he involved in its execution. The Nursing Home Group sought to hold Griffeth liable for the unpaid debt of Suncrest because he was its sole shareholder and director.

{¶ 12} Generally, shareholders are not liable for the debts of the corporation. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 287, 617 N.E.2d 1075. "[T]he burden of proof is upon the party seeking to impose individual liability on the shareholder to demonstrate that the grounds for piercing the corporate veil exist." *Univ. Circle Research Ctr. Corp. v. Galbreath Co.* (1995), 106 Ohio App.3d 835, 840, 667 N.E.2d 445.

{¶ 13} Creditors of a corporation may "pierce the corporation's veil" and hold individual shareholders liable only when the following three conditions are present:

(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the [appellees] from such control and wrong.

*Belvedere*, 67 Ohio St.3d 274, 617 N.E.2d 1075, at paragraph three of the syllabus.

{¶ 14} Griffeth contends that the trial court should have granted him a directed verdict because, among other reasons, the Nursing Home Group failed to present any evidence to establish the second prong of this test: that he committed fraud or an illegal act. We agree.

{¶ 15} Civ.R. 50(A) authorizes the trial court to grant a directed verdict when after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable

minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Civ.R. 50(A)(4).

{¶ 16} Although the directed-verdict standard requires the court to construe the evidence most strongly in favor of the nonmoving party, the Nursing Home Group presented absolutely no evidence that Griffeth committed fraud or an illegal act.

■ {¶ 17} Most of the evidence at trial focused on the fact that Suncrest entered into a contract with the Nursing Home Group and breached that agreement by failing to pay four of the invoices submitted, totaling over $100,000. Griffeth does not dispute that Suncrest failed as a business or that it breached its agreement with the Nursing Home Group. The Nursing Home Group was required to prove more than a breach of contract, however, to hold Griffeth personally liable for his corporation's breach of contract.

> A simple breach of contract, in the absence of a more substantial factual predicate indicative of some corporate malfeasance, with direct bearing on the plaintiff's injury, is insufficient to meet the second prong of the *Belvedere* test. To decide otherwise, would completely vitiate the holding in *Belvedere*.

*Connolly v. Malkamaki,* 11th Dist. No. 2001–L–124, 2002-Ohio-6933, 2002 WL 31813040, at ¶ 34.

■ {¶ 18} The Nursing Home Group repeatedly argued that, when Suncrest received the funds from Medicaid and Medicare in August 2001, some of that money should have been applied to Suncrest's outstanding debt to the Nursing Home Group. There was no evidence that Suncrest was legally required to do so, however, nor was there evidence of any legal restrictions on Suncrest's use of Medicaid and Medicare reimbursement funds.

{¶ 19} Although the Nursing Home Group asserts in its brief that Griffeth "had a choice" whether to use these funds to reduce the credit line or to pay Suncrest's vendors, the evidence was undisputed that Griffeth had no such choice. Suncrest's bank account at Provident Bank was set up as a sweep account so that all deposits into the account automatically were applied to pay down the credit line, if there was any balance. At the time the Medicaid and Medicare reimbursement funds were deposited into the account, there was a balance of over $497,000 on the credit line. Thus, the deposit of over $400,000 in funds was automatically applied to pay down the credit line, and there was nothing that Griffeth or anyone else could have done to prevent that.

■ {¶ 20} The Nursing Home Group also repeatedly stressed that, even if the Medicaid and Medicare reimbursement funds were applied to pay down the credit

line, nothing prevented Suncrest, at Griffeth's direction, from continuing to write checks against the credit line to pay off its vendors, despite the fact that the business had closed and there would not likely be any revenue to pay off the line of credit. Even if Griffeth could have directed someone to write a check to pay off Suncrest's debt to the Nursing Home Group, he was not legally required to do so. Moreover, Provident Bank, unlike the Nursing Home Group, had taken a security interest in some of the assets of Suncrest to ensure that its debt would be paid if Suncrest was not successful as a new business. By failing to write additional checks against the credit line, Suncrest avoided increasing the corporation's debt to a secured creditor, albeit at the expense of unsecured creditors.

{¶ 21} The bank also had required Griffeth to sign as a guarantor of the loan both personally and on behalf of Griffeth Nursing Home. Although the Nursing Home Group suggests that Suncrest's failure to pay all of its vendors somehow caused funds to improperly wind up in Griffeth's hands, that was not what happened here. Griffeth could have chosen to pay off all of the unsecured debts of his failing corporation, and in turn assumed additional personal liability on the credit line, but he did not. Although Suncrest's failure to continue paying unsecured creditors after the facility closed did avoid increasing Griffeth's personal liability exposure, that failure was not akin to using corporate assets for his own benefit at the expense of the corporation's creditors. See, e.g., *Willoway Nurseries v. Curdes* (Oct. 13, 1999), 9th Dist. No. 98CA007109, 1999 WL 820784. There was absolutely no evidence that any corporate funds or assets had been mismanaged or used for Griffeth's personal benefit.

{¶ 22} The evidence presented at trial simply demonstrated that Suncrest was a business that failed and that several creditors, including the Nursing Home Group, did not receive full payment for their services. The person in charge of accounts payable at the management company testified that the Nursing Home Group was treated the same as any other creditor. This same witness indicated, as did others, that only one of the unpaid invoices from the Nursing Home Group was past due at the time Suncrest closed. She further testified that, at some point after Suncrest closed, Corwin, who was in charge of the management group, instructed her to stop paying any of the outstanding bills.

{¶ 23} The nursing home administrator testified that, when she learned that Suncrest was having trouble paying its bills, she expressed concern that Suncrest make sure that its residents had food and working utilities and that their needs were being met. She further explained, as did Corwin and other witnesses, that it did not seem that Griffeth was trying to defraud or deceive anyone, but that he was an honest businessman in a difficult business situation. Corwin further testified that Griffeth had told him to try to collect as much money as he could so that as many vendors as possible could be paid.

{¶ 24} As there was no evidence presented that Suncrest failed to pay its debt to the Nursing Home Group due to any fraudulent or illegal act by Griffeth, or anyone else at Suncrest, the trial court erred in failing to grant Griffeth's motion for a directed verdict at the close of the plaintiff's evidence. The second assignment of error is sustained.

## ASSIGNMENT OF ERROR I

The trial court erred by denying Gerald R. Griffeth's motion for directed verdict at the conclusion of the opening statements of the Nursing Home Group Rehabilitation Services, LLC.

## ASSIGNMENT OF ERROR III

The verdict of the jury was against the manifest weight of the evidence.

## CROSS–ASSIGNMENT OF ERROR I

The trial court erred in failing to instruct the jury on awarding punitive damages.

## CROSS–ASSIGNMENT OF ERROR II

The trial court failed to adequately instruct the jury on the full breadth of the standard for piercing the corporate veil.

{¶ 25} Because we have determined that the trial court erred by failing to grant Griffeth a directed verdict after the close of the Nursing Home Group's evidence, and that this case never should have gone to the jury, we need not reach the merits of the remaining assignments of error or the cross-assignments of error. See App.R. 12(A)(1)(c).

{¶ 26} The judgment of the Summit County Court of Common Pleas is reversed, and the cause is remanded for the purpose of vacating the prior judgment and entering judgment in favor of Griffeth.

Judgment reversed
and cause remanded.

CARR and BATCHELDER, JJ., concur.