NOT RECOMMENDED FOR PUBLICATION
File Name: 09a0019n.06
Filed: January 9, 2009

**No. 08-3496**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TRANSITION HEALTHCARE ASSOCIATES, INC., | ) ) ) | |
| *Plaintiff - Appellant,* | ) ) ) | **ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO AT TOLEDO** |
| v. | ) ) | |
| TRI-STATE HEALTH INVESTORS, LLC, | ) ) ) | |
| *Defendant - Appellee.* | ) | |

**BEFORE: COLE and COOK,  Circuit Judges; EDMUNDS,** *** District Judge**

    **EDMUNDS, District Judge.**  Plaintiff-Appellant Transition Healthcare Associates, Inc. (Transition) appeals the district court's grant of Defendant-Appellee Tri-State Health Investors, LLC's (Tri-State) motion for summary judgment in this action for breach of contract, suit on account, and unjust enrichment.  Transition argues that the district court erred by basing its grant of summary judgment on Transition's failure to set forth the requisite evidence to pierce the corporate veil under Ohio law when neither party's briefs raised this theory.  Transition also argues that even

---

*The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

if the district court properly applied a veil-piercing theory, it erred by granting Tri-State's motion. For the foregoing reasons, we AFFIRM the district court's decision.

## I.

Appellant Transition is an Ohio corporation that provides rehabilitation programs to nursing homes. In March of 2004, it entered into three separate Provider Agreements with three nursing facilities in Ohio. Per these agreements, Transition would provide therapy services for an agreed-upon fee to residents of Elm Creek Nursing Center in West Carrollton, New London Healthcare Center in New London, and Spring Creek Nursing and Rehabilitation Center in Huber Heights.[1] The parties to each agreement were Transition and the facility. An administrator or regional director of each facility signed the agreement on the facility's behalf.

Transition provided therapy services to the facilities from March 2004 to November 17, 2006. Transition alleges that beginning in 2005, the facilities stopped regularly paying Transition and now owe $334,807.42, plus interest.

### A.     Creation of Ohio Limited Liability Corporations

In September of 2003, Tri-State Healthcare of New London, LLC, Tri-State Healthcare of West Carrollton, LLC, and Tri-State Healthcare of Huber Heights, LLC were registered in the state of Ohio as foreign limited liability corporations. The registration forms direct correspondence to the LLCs at Tri-State Health Investor, LLC's Florida address. The forms list Barry Shisgul as the LLCs' statutory agent to receive process at the Ohio addresses of the three nursing facilities and as their

---

[1]Each of these facilities is a distinct corporate entity licensed to provide nursing care in the state of Ohio. Records of incorporation show that Firelands of IHS, Inc., Spring Creek of IHS, Inc., and Elm Creek of IHS, Inc. were licensed to own and operate nursing facilities in the state.

authorized representative at Tri-State Health Investors, LLC's Florida address. Tri-State President Avi Klein testified that the forms were incorrect because Barry Shisgul never worked at Tri-State.

According to Tri-State, the LLCs were created for the purpose of taking ownership of the facilities from Elm Creek of IHS, Inc., Firelands of IHS, Inc., and Spring Creek of IHS, Inc. Klein testified that Shisgul was the LLCs' sole owner, shareholder, and member and planned to operate the facilities once ownership was transferred. According to Klein, this transfer never occurred.[2]

## B.     Tri-State's Role in the Operation of the Facilities

Defendant-Appellee Tri-State Health Investors, LLC was created as a Florida limited liability company on August 18, 2003 with its sole place of business located in Miami-Dade County, Florida. Avi Klein was its Manager, President, and sole owner and shareholder. Tri-State asserts that it had a contractual relationship with Tri-State Healthcare of West Carrollton, LLC, Tri-State Healthcare of New London, LLC, and Tri-State Healthcare of Huber Heights, LLC to provide back-office administrative support to the nursing facilities. Klein testified that its contract to provide these limited administrative services was oral, month-to-month, and part of the plan by which the three limited liability corporations were going to take ownership of the facilities.[3]

The primary service that Tri-State provided was the paying of the facilities' vendor invoices. When the facility received an invoice from a vendor such as Transition its administrator would verify

---

[2]Transition calls this claim "implausible at best." (Appellant's Br. at 21.) It is, thus, disputed whether the nursing facilities signed the Provider Agreements as Firelands of IHS, Inc., Spring Creek of IHS, Inc., and Elm Creek of IHS, Inc. or as Tri-State Healthcare of New London, LLC, Tri-State Healthcare of Huber Heights, LLC, and Tri-State Healthcare of West Carrollton, LLC.

[3]Klein describes the period during which Tri-State provided these services — from September 1, 2003 to September 30, 2006 — as a "limbo period." (Joint Appendix (JA) 95.)

3

that the service had been provided, sign a voucher for the bill to be paid, and mail the voucher and invoice to Charley Menten, an employee at Tri-State in Florida.[4] Menten would cut a check to pay the invoice from the facility's bank account, and Avi Klein would sign it. At the beginning of this period, the check would then be sent back to the facility, which would send it to Transition. Eventually, Tri-State mailed checks directly to Transition. Susan Rusnak, the New London facility's administrator, recalls hearing from Transition's president on more than one occasion that Transition's vouchers had not been paid. Menten would sometimes tell Rusnak that he would call Transition and take care of the situation or he would explain that he was waiting on Mr. Klein's signature. Other times, Menten explained that the priorities were payroll and benefits-related expenses. Rusnak testified that many vendors were not paid, and "[i]t was as if [Menten] would pick and choose who would be paid for." (JA 68-69.)

Tri-State paid the invoices from checking accounts it had opened, with Barry Shisgul's permission, at a Florida bank.[5] The address on each account was Tri-State's Florida address, and Tri-State received the monthly statements. All the checks in the record were signed by Klein, but Barry Shisgul may also have had signature authority. The facilities would either deposit funds directly in these bank accounts or send them to Tri-State in Florida to be deposited.

According to Rusnak, Tri-State did not do "a whole lot" else to manage her facility, which was "very much on [its] own." (JA 70.) In September 2003, Avi Klein held a conference call with

---

[4]Transition sent all invoices to the facilities and never to Tri-State in Florida.

[5]The names on the three accounts were: "Tri-State Healthcare of New London, LLC dba New London Health Center dba IHS of New London at Fireland"; "Tri-State Healthcare of West Carrollton, LLC dba Elm Creek Nursing Center dba IHS of Elm Creek"; and "Tri-State Healthcare of Huber Heights, LLC dba Spring Creek Nursing and Rehabilitation Center."

4

the facilities' administrators. Klein and Ted Duay, Tri-State's Chief Financial Officer, visited the New London facility once for two hours, during which time they toured the facility and met with Rusnak and a consultant to discuss increasing occupancy. Klein oversaw regional directors and consultants who monitored the facility's vacancy rate and communicated with administrators about clinical care. Tri-State did not disseminate any policies to the facility, and the facility did not generate reports for Tri-State. Duay helped the facilities with their budgets and once sent the New London facility a summary of its revenue and expenses. The facility handled accounts receivable and the Medicare/Medicaid reimbursement process.[6]

Tri-State received two and a half percent of gross revenue each month as compensation for its services, which Tri-State paid itself from facility accounts. According to Klein, the facilities were aware that Tri-State was withdrawing this fee. Klein testified that Tri-State Healthcare of West Carrollton, LLC, Tri-State Healthcare of New London, LLC, and Tri-State Healthcare of Huber Heights, LLC received no compensation because they never took ownership of the facilities.

Rusnak believes that Tri-State Health Investors, LLC provided management services for some other entity that owned the facility during this period.[7] Rusnak testified that when the Provider Agreement was signed, the facility was licensed by the state as Firelands of IHS, Inc. and that New London's license never listed Tri-State Health Investors, LLC. Rusnak also testified that

---

[6]Menten eventually had the notifications of Medicare/Medicaid deposits directed to him.

[7]In 2003, Integrated Health Systems (IHS), which owned and operated the New London Healthcare Center, filed for bankruptcy. Rusnak did not know if IHS continued to own the facility.

5

at that time, she and the facility's regional director, Dan Grant, were employed by Tri-State Health Investors, LLC.[8]  Tri-State denies ever employing any facility staff or regional directors.

## C.      Tri-State's Registration as a Limited Liability Corporation in Ohio

On September 8, 2003, the Florida law firm that registered Tri-State Healthcare of New London, LLC, Tri-State Healthcare of West Carrollton, LLC, and Tri-State Healthcare of Huber Heights, LLC registered Tri-State Health Investors, LLC as a foreign limited liability company in Ohio.  The form directs correspondence to Tri-State Health Investors, LLC in Florida and lists Avi Klein as the statutory agent to receive process at the Ohio address of the Spring Creek nursing facility.  Avi Klein's signature appears on the form as the authorized representative at Tri-State's Florida address, but Klein denies signing the form.  Klein testified that he was unaware that he was listed as this entity's statutory agent and that he never had an office in Ohio.  Tri-State denies that this entity conducted business in Ohio and cancelled the registration in June of 2007.

## D.      Tri-State's Involvement in the Facilities' Pharmacy Agreements

In June of 2004, Avi Klein signed Pharmacy Services Agreements with PharMerica on behalf of the three nursing facilities.  These Agreements list Klein as the owner of the facilities and direct notices to be sent to Tri-State Health Investors, LLC in Florida.  Klein testified that he was never the owner of these entities, that PharMerica wrote these contracts, and that Klein alerted it to the mistake. Klein also testified that PharMerica's representative told Klein to sign the contracts anyway and that they would be changed later.  Klein testified that he signed the contracts despite the mistake

---

[8]Rusnak's paychecks did not come from Tri-State, and she did not sign an employment contract with Tri-State.  Rusnak did use a Tri-State e-mail address with the same domain name as Klein's e-mail address.

because the facilities would otherwise have gone without needed pharmacy services. Klein does not recall signing new, corrected versions of these agreements but testified that he had subsequent conversations with PharMerica about correcting the contracts.

## II.

On November 28, 2006, Transition filed a lawsuit against Tri-State Health Investors, LLC in the Northern District of Ohio, alleging breach of contract, amount due on account, and unjust enrichment. Transition attached as exhibits to its Complaint the Provider Agreements that it had executed with the three nursing facilities and Customer QuickReports showing the amount of money owed by the facilities. The QuickReports, like the Provider Agreements, do not mention Tri-State.

Tri-State's Answer denied all allegations and asserted several affirmative defenses, including the following: Plaintiff failed to state a cause of action because it "did not render any services to Defendant," "did not execute a contract with Defendant," and "Defendant did not receive any services or benefit thereof from Plaintiff"; "Plaintiff's claims are barred by Failure of Consideration in that Plaintiff never performed any services alleged in the Complaint for Defendant or Defendant's benefit"; "Plaintiff's claims are barred by lack of privity of contract in that there is no contract or agreement under which Plaintiff was to provide any services to Defendant"; "Plaintiff's action is barred from recovery based on Plaintiff's failure to join . . . the skilled nursing care facilit[ies]"; and that "Defendant is an improper party to this action." (JA 43-48.)

On November 1, 2007, Tri-State filed a motion for summary judgment, arguing that it was entitled to judgment as a matter of law because no contract existed between Transition and Tri-State, Tri-State did not receive the benefit of Transition's services, and Tri-State did not operate the

7

facilities. Tri-State underscored that Transition's contract was with the nursing facilities, which were distinct corporate entities. Tri-State attached the following as exhibits to its motion: Klein's affidavit denying any corporate affiliation between Tri-State and the facilities; Tri-State's registration as a Florida limited liability company; 1990 articles of incorporation for Firelands of IHS, Inc., Spring Creek of IHS, Inc., and Elm Creek of IHS, Inc. to own and operate nursing facilities in Ohio; and 2006 letters from the Ohio Department of Health to Spring Creek of IHS, Inc., Firelands of IHS, Inc., and Elm Creek of IHS, Inc., confirming approval of the facilities' operation through January 2007.

In response, Transition asserted that Tri-State managed the facilities and that "genuine issues of material fact support[] the conclusion that [Tri-State] was, in fact, the owner/operator of the Facilities." (Pl.'s Br. in Opp. to Def.'s Mot. for Summary J. at 3.) To prove this, Transition described Tri-State's "day-to-day control over the Facilities." (*Id.* at 11.) In reply, Tri-State reiterated that Transition had failed to present a basis to hold Tri-State liable for the facilities' debt.

On March 25, 2008, the district court granted Tri-State's motion for summary judgment, noting that although Tri-State took "actions indicative of ownership," it "never formally owned the facilities." (JA 51, 55.) The district court identified the sole issue to be whether Tri-State could, nonetheless, be held liable for the facilities' debt, under a corporate-veil-piercing theory. The district court held that Transition had failed to present evidence such that a reasonable jury could conclude that it met the requirements for piercing the corporate veil under Ohio law. Plaintiff appealed.

**III.**

This court reviews a district court's grant of summary judgment *de novo*. *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007). Summary judgment is appropriate only when there

8

is "no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

**IV.**

"[B]efore summary judgment may be granted against a party, Fed. R. Civ. P. 56(c) mandates that the party opposing summary judgment be afforded notice and a reasonable opportunity to respond to all issues to be considered by the court." *Routman v. Automatic Data Processing*, *Inc.*, 873 F.2d 970, 971 (6th Cir. 1989). "Rule 56(c) requires at a minimum that an adverse party be extended at least ten days notice before summary judgment may be entered." *Id.* And this court has noted that "'implicit in the 'opportunity to respond' is the requirement that sufficient time be afforded for discovery necessary to develop 'facts essential to justify [a party's] opposition to the motion.'"" *Id.* (quoting *Portland Retail Druggist Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981) (internal citations omitted)). "Noncompliance with [these requirements] deprives the court of authority to grant summary judgment" unless "there has been no prejudice to the opposing party by the Court's failure to comply." *Kistner v. Califano*, 579 F.2d 1004, 1006 (6th Cir. 1978); *see also Yashon v. Gregory*, 737 F.2d 547, 552 (6th Cir. 1984).

9

Because the party against whom an entry of summary judgment is being contemplated must be "afforded a fair opportunity to show why summary judgment should not be granted," this court has reversed *sua sponte* grants of summary judgment when the losing party was not given notice and an opportunity to respond. *Yashon*, 737 F.2d at 552 (district court did not "follow proper procedures" in granting summary judgment against plaintiff when defendant had not moved for summary judgment and plaintiff had no notice); *see, e.g.*, *Harrington v. Vandalia-Butler Bd. of Educ.*, 649 F.2d 434, 436 (6th Cir. 1981) (district court erred by treating defendants' letter as a summary-judgment motion and granting it eight days later without affording plaintiff opportunity to respond to its contents); *Kistner*, 579 F.2d at 1005-06 (vacating district court's grant of summary judgment when neither party had moved for summary judgment or had notice of district court's intentions); *see also Beaty v. United States*, 937 F.2d 288, 291 (6th Cir. 1991) (noting disapproval of district court's entry of *sua sponte* summary judgment without giving notice to parties). For the same reason, this court has also reversed district-court grants of summary judgment when they were based on grounds not raised by the moving party. *See, e.g.*, *Routman*, 873 F.2d at 970-72 (district court erred by granting summary judgment on issue it had expressly prohibited parties from developing in discovery or in briefing).

Transition argues that the district court erred by basing its entry of summary judgment on Transition's failure to satisfy the requirements for piercing the corporate veil under Ohio law. It is true that neither Tri-State nor Transition mentioned the phrase 'piercing the corporate veil' in their briefing, and neither party described the requirements in Ohio for doing so. Nevertheless, Tri-State's motion for summary judgment and accompanying brief expounded upon the affirmative defenses it raised in its Answer. Tri-State argued that the court should rule in its favor as a matter of law

10

because Transition had failed to present sufficient evidence that it had entered into a contract with Tri-State, that Tri-State had received any benefit from Transition, or that Tri-State was the operator of the nursing facilities.[9]

Upon reviewing the evidence presented, the district court rightly found that Transition had failed to present any evidence that Tri-State was the direct owner of the facilities as assets. Tri-State had put Transition on notice with its brief and the attached records of incorporation that it was arguing that the fact that the nursing facilities were distinct corporate entities precluded Transition from holding Tri-State liable for their debts. *See Vaughn v. Cannon U.S.A., Inc.*, No. 90-2038, 1991 WL 177970, *4 (6th Cir. Sept. 12, 1991) (non-moving party had adequate notice that theory could form basis of entry of summary judgment when moving party cited case dealing with theory in reply brief and attached article about case to reply brief). The district court was faced with evidence that, regardless of whether the facilities that contracted with Transition were Firelands of IHS, Inc., Spring Creek of IHS, Inc., and Elm Creek of IHS, Inc. or Tri-State Healthcare of New London, LLC, Tri-State Healthcare of Huber Heights, LLC, and Tri-State Healthcare of West Carrollton, LLC., they were, nonetheless, corporate entities distinct from Tri-State Health Investors, LLC. Therefore, the district court did not err by applying the only theory of recovery available to Transition, and assessing whether Transition could pierce the corporate veil to hold Tri-State liable for the facilities' debts in spite of their corporate identities. *See Minno v. Pro-Fab*, No. 2007-T-0021, 2007 WL

---

[9]Tri-State explained that Transition had entered into contracts with three nursing facilities that were, themselves, distinct corporate entities. To bolster its claims, Tri-State attached to its summary-judgment motion the incorporation records of the three facilities, which showed that they were separate corporate entities, as well as a printout of Transition's alleged unpaid invoices which made no mention of Tri-State. Transition responded to Tri-State's motion by presenting its evidence that Tri-State was the owner and/or manager of the nursing facilities.

11

4292625, *4 (Ohio Ct. App. Dec. 7, 2007) (noting that "'[p]iercing the corporate veil is not a claim, it is a remedy encompassed within a claim'" (internal citation omitted)), *cert. granted*, 885 N.E.2d 954, (Ohio May 7, 2008).[10]

## V.

We now turn to Transition's contention that it presented sufficient evidence to survive summary judgment on the issue of piercing the corporate veil. "A parent corporation generally is not liable for the acts of its subsidiary, even if its subsidiary is wholly owned." *Corrigan*, 478 F.3d at 724. "'[A] corporation is a legal entity, apart from [those] who compose it.'" *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1085 (Ohio 1993) (internal citations omitted). "[I]n extraordinary cases," however, "courts will pierce the corporate veil and disregard the corporate entity, treating the parent corporation and its subsidiary as a single entity." *Corrigan*, 478 F.3d at 724. "In such cases, the subsidiary corporation is treated as the 'alter ego' of the parent corporation shareholder and the parent corporation may be held liable for the obligations of the subsidiary." *Id.* "The burden of proof to demonstrate grounds for piercing the corporate veil is on the party seeking to impose liability on the parent corporation." *Id.*

Under Ohio law, "the corporate form may be disregarded" and one corporation held liable for the misdeeds of another when the following conditions are met:

---

[10]Not only did Tri-State's briefs put Transition on notice that this theory would be necessary to the district court's assessment of the summary-judgment motion, but Transition's Response suggests that it was presenting a corporate-veil-piercing theory. That is, in addition to stating that Tri-State was the owner of the facilities, Transition argued that Tri-State exerted "day-to-day control" over the facilities as their manager. In fact, most of the evidence that Transition presented concerned Tri-State's involvement in the facilities' operations rather than its ownership of them.

(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own; (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere*, 617 N.E.2d at 1086, *as modified by Dombrowski v. WellPoint, Inc.*, 895 N.E.2d 538, 540 (Ohio 2008).[11]

"The first prong of *Belvedere* has been referred to as the 'alter ego doctrine,' and in order to succeed under this prong, 'a plaintiff must show that [the two corporations] are fundamentally indistinguishable.'" *Siva v. 1138 LLC*, No. 06AP-959, 2007 WL 2634007, *2 (Ohio Ct. App. Sept. 11, 2007) (internal citation omitted). In assessing whether the first prong has been satisfied, Ohio courts consider several factors, such as: (a) grossly inadequate capitalization; (b) failure to observe corporate formalities; (c) insolvency of the debtor corporation at the time the debt was incurred; (d) the parent holding itself out as personally liable for certain subsidiary obligations; (e) diversion of funds or other property of the subsidiary for the parent's use; (f) the absence of corporate records; and (g) the fact that the subsidiary was a mere facade for the operations of the parent." *Corrigan*, 478 F.3d at 724 (citing *LeRoux's Billyle Supper Club v. Ma*, 602 N.E.2d 685, 689 (Ohio Ct. App. 1991)). This court has noted, however, that "none of these factors is a prerequisite to a finding that the corporate form has been violated." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 705 (6th Cir. 1988); *see also Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th

---

[11]Ohio law governs because "a federal court sitting in diversity applies the substantive law of the forum state." *Consumers Power Co. v. Amoco Prod. Co.*, No. 97-1712, 2000 WL 245438, *3 n.2 (6th Cir. Feb. 24, 2000) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

Cir. 2005) ("'[B]ecause of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive'" (internal citation omitted)).[12]

In order to meet the second prong of the *Belvedere* test, a plaintiff must prove commission of "fraud, an illegal act, or a similarly unlawful act." "A corporation's breach of contract, standing alone, is insufficient." *Siva*, 2007 WL 2634007, at *5.[13]

The Ohio Supreme Court has emphasized that only "extreme shareholder misconduct" satisfies prong two of the *Belvedere* test. *Dombrowski*, 895 N.E.2d at 545; *see also Pritchett, Dlusky & Saxe v. Pingue*, No. 96APE11-1598, 1997 WL 578952, *5 (Ohio Ct. App. Sept. 16, 1997) (piercing corporate veil appropriate when defendant "manipulated his wholly-owned corporations

---

[12]In *Corrigan v. U.S. Steel Corporation*, the plaintiff did not present sufficient evidence of an alter ego relationship to survive summary judgment when parent company entered a few agreements on behalf of subsidiary and the two shared some officers and employees. 478 F.3d at 726. The court held that evidence of "isolated incidents of control" by parent company did not suffice since they did not show that one company "had taken over the day-to-day operations" of the other. *Id.*; *see also Taylor*, 417 F.3d at 606-07 (plaintiff presented sufficient evidence that individual was alter ego of corporation when she maintained "absolute control" over company, made decision to breach contract at issue in case, and had sole control over movement of funds among her businesses). Appellant relied in its briefing on appeal on *Minno v. Pro-Fab*, No. 2007-T-0021, 2007 WL 4292625 (Ohio Ct. App. Dec. 7, 2002) – a case in which the court found sufficient evidence of an alter ego relationship. *Id.* at *6. The Ohio Supreme Court has, however, accepted an appeal of this case for review. 885 N.E.2d 954 (Ohio May 7, 2008).

[13]*See also Connolly v. Malkamaki*, No. 2001-L-124, 2002 WL 31813040, *7 (Ohio Ct. App. Dec. 13, 2002) (if breach of contract met second prong it "would completely vitiate the holding in *Belvedere*"); *see also LeRoux's Billyle Supper Club*, 602 N.E.2d at 691 (even though plaintiff's inability to collect on contract may appear "unjust" or "inequitable," "[s]uch a happening does not" warrant "disregard[ing] the corporate entity"); *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 674 (6th Cir. 1999) (upholding district court's refusal to pierce corporate veil where plaintiff "failed to show any criminal, fraudulent, or deceptive action on [defendant's] part or that he induced the contract; misrepresented his relationship to and with [the corporation]; or abused the corporate form"); *id.* (noting that "[a] party who suffers a loss from a *corporation's* breach ordinarily has recourse against the corporation and its assets or guarantors, if any" (emphasis in original))

for his personal benefit" by using corporate assets to pay his debts and expenses); *Clinical Components Inc. v. Leffler Indus., Inc.*, No. 95CA0085, 1997 WL 28246, *4-5 (6th Cir. Jan. 22, 1997) (plaintiff presented sufficient evidence to survive summary judgment on *Belvedere*'s second prong by showing that assets were systematically transferred to parent company to detriment of creditors.)

Even if Tri-State was the parent or sister company of the facilities, Transition must present sufficient evidence such that a reasonable jury could conclude that Tri-State was liable for their debt as their alter ego. The district court held that the only factor possibly present to support alter-ego status was Tri-State's diversion of funds from the nursing facilities and that this was insufficient to satisfy prong one on summary judgment. When viewed in the light most favorable to it, Transition's evidence suggests that: Tri-State and Transition shared management and personnel; Tri-State exerted some degree of control over the facilities' operation; Tri-State had some involvement in the creation of the nursing facilities as limited liability corporations; Tri-State entered into a pharmacy services agreement on behalf of the facilities; Tri-State played a role in the facilities' strategic planning; Tri-State made the decision whether to breach the contract at issue in this case; and Tri-State was paid a percentage of the nursing facilities' revenue for its services. This court has made clear that "proof of some overlapping management between subsidiary and parent is an insufficient basis to pierce the corporate veil," and the evidence presented by Transition does little more than describe a management relationship. *Corrigan*, 478 F.3d at 726. Thus we conclude that the district court did not err in granting summary judgment on the alter ego issue.

Moreover, Transition failed to present sufficient evidence to create a genuine issue of fact for prong two of *Belvedere. See, e.g.*, *Nursing Home Group Rehab. Servs., Inc. v. Suncrest Health*

15

*Care, Inc.*, 834 N.E.2d 382, 386-88 (Ohio Ct. App. 2005) (corporate owner not liable for nursing home's failure to pay invoices when no showing of fraud or illegal act); *Belvedere*, 617 N.E.2d at 1086-87 (corporate veil could not be pierced absent showing of fraud because "mere control over a corporation is not in itself a sufficient basis for shareholder liability."). The district court did not err in finding that Transition had failed to present any evidence that Tri-State's control over the nursing facilities resulted in fraud or illegality. Mere breach of contract is insufficient to satisfy prong two, and that is the most that Transition has presented.[14]

## VI.

We conclude that the district court did not err by evaluating Transition's claims under Ohio law for piercing the corporate veil, and we AFFIRM the district court's grant of summary judgment in favor of Tri-State.

---

[14]Transition argued in its briefing on appeal that it had satisfied prong two because the terms "fraud" and "illegal act" in *Belvedere* "encompass a broader range of actions, namely those acts that would lead to unfair or inequitable results." (Appellant's Br. at 24). Transition relied for this proposition, however, on cases that were abrogated by the Ohio Supreme Court in *Dombrowski v. WellPoint, Inc.*, 895 N.E.2d 538 (Ohio 2008). *See Dombrowski*, 895 N.E.2d at 544-45 (rejecting "expansion of the second prong of the *Belvedere* test to include unjust or inequitable conduct" since it would mean that "virtually every close corporation could be pierced when sued, as nearly every lawsuit sets forth a form of unjust or inequitable action."); *see also Sanderson Farms, Inc. v. Gasbarro*, No. 07-4252, 2008 WL 4764118, *5 (6th Cir. Oct. 24, 2008) (recognizing that "[t]he Ohio Supreme Court recently rejected this expansive construction of the second *Belvedere* prong"). Transition acknowledged the *Dombrowski* decision at oral argument.